**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**DANNY DARRELL HARRIS,**

      **Plaintiff,**

**vs.**                          **Case No. 1:17cv281-MW/CAS**

**NANCY A. BERRYHILL, Deputy
Commissioner for Operations,
Social Security Administration,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDTION

      This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's applications for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act).  After careful consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History and Facts

On November 9, 2013, Plaintiff filed an application with the Social Security Administration for a period of disability and Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act.  Tr. 71.[1]  He alleged disability beginning October 1, 2013, based on degenerative disc disease, anxiety, depression, obesity, degenerative joint disease right knee, ankle fracture, left-sided carpal tunnel syndrome, and diabetes. Tr. 201.  On September 3, 2014, the application was denied, and was again denied on reconsideration on December 16, 2014.  Tr. 135, 138.  A hearing was held on October 12, 2016, before Administrative Law Judge (ALJ) John D. Thompson, Jr.  Tr. 39-108.  Plaintiff appeared with counsel and testified, and impartial vocational expert Jackson C. McKay also testified.  On December 15, 2016, a decision was issued finding Plaintiff was not disabled.  Tr. 17-33.  The Appeals Council denied review on September 7, 2017.  Tr. 1-5.

On November 8, 2017, Plaintiff, appearing through counsel, filed a complaint for judicial review pursuant to 42 U.S.C. § 405(g).  *See* ECF No.

---

[1] Citations to the transcript/administrative record (ECF No. 10) shall be by the symbol "Tr." followed by a page number that appears in the lower right corner of each page.

1.  Respondent filed an answer on February 6, 2018, ECF No. 9, and both parties filed memoranda in support of their positions.  ECF Nos. 12, 13.

## A.  The Hearing

At the hearing held October 12, 2016, Plaintiff testified that he was 51 years old on the date of the hearing and has a master's degree in business, which was conferred in 2009.  Tr. 43.  He has been on Veterans Administration disability since he left the military in 1986.  Tr. 56.  He said his disability percentage has been raised over the years due to his condition worsening.  Tr. 57.

Plaintiff has an unrestricted driver's license but only drives short distances.  Tr. 44.  He last worked as a part-time unarmed security guard in 2013.  Tr. 45.  The job entailed sitting, with some standing and walking, but no lifting or carrying.  Tr. 47.  He kept written logs of each shift.  Tr. 48.  He worked as a security guard in 2009 for another employer, and as a security guard in 2006 and 2007, which also involved some light maintenance, such as sweeping.  Tr. 49.  In 2003 and 2008, he worked as a laborer in the city utility department, and in 2001 and 2002, he worked as a service technician for Bell South Communications.  Tr. 50.

Plaintiff testified that he was let go from his last job in 2013 due to downsizing, but he was planning to resign because he could not have

continued.  Tr. 54-55.  He said one of his main problems is his back, which

he hurt in his last job.  Tr. 60.  He has been getting treatment at the VA and

was supposed to get injections in his back.  He was given a back brace and

pain medications.  Tr. 60.  He testified he weighed about 280 to 290

pounds when he worked as a security guard.  Tr. 61.  He weighed 310

pounds as of the date of the hearing, and said the VA wants him to lose

weight and go to physical therapy for his back.  Tr. 60-61, 63.  Plaintiff

testified he had trouble losing weight due to his diabetes, and cannot do

any exercises, like riding a stationary bike or walking.  Tr. 67-68.  He takes

Metformin and Glipizide for his diabetes.  Tr. 68.

He testified that he had several "incidents" while working, including

one time when he could not get up from a sitting position for 45 minutes.

Tr. 62, 98.  He testified that he has problems with his right knee, has

received one injection in his knee, and was told he would need knee

replacement.  Tr. 65-66.  He has had no physical therapy for his knee, but

had a Velcro knee brace and is expected to have more knee injections.  *Id.*

He said he has only seen an orthopedist once about his knee in May of

2016.  Tr. 67.

Plaintiff testified that he has other physical problems, including

problems with both feet, left ankle, and left leg.  Tr. 69.  He is taking pain

medication, including Naprosyn, Vicodin, and Gabapentin (for neuropathy). Tr. 70. He said he has burning, shooting pains in his feet and in his hand, and his left foot swells up. *Id.* He had X-rays on his foot and was given an ankle brace. Tr. 71. The burning and tingling "comes and goes" and sometimes wakes him up at night. *Id.*

Plaintiff testified that he began receiving treatment for psychiatric problems before 2013, and the problems got worse during the latter part of his last job and after he left the job, when he became depressed. Tr. 72-75. He takes Ambien for sleeping and Lorazepam for anxiety. Tr. 74. He said he was hospitalized for a week at the Vines Hospital in 2015 for one of his suicide attempts. Tr. 75. He testified he tried to kill himself several times. The last time he tried, he had stopped taking his medication because he thought he did not need it. Tr. 76-77. He said that after that, he took his medication as directed, although he ran out of medication due to a mistake on his part and ended up in the emergency room. Tr. 77.

He testified he has been doing better on his medication, but still has severe anxiety. He gets nervous and agitated being around people, who he feels are judging him. Tr. 78. When he was last employed as a security guard, no one was around in that job and he was completely by himself. Tr. 79.

Additional medical problems related by Plaintiff were numbness in his left hand that started about six months earlier, for which he had a nerve conduction study and was told will require surgery.  Tr. 79-80.  Plaintiff appeared at the hearing in a wheelchair, which he explained was necessary because his right knee is damaged and his left hip and knee are bothering him.  The wheelchair was not prescribed by a doctor, but he planned to see a doctor about these problems.  Tr. 81.  He said he had been prescribed a cane and crutches.  Tr. 82.  The left knee problem "really just started up . . .  in the last couple of months."  *Id.*

He said sitting for long periods aggravates his hip, and he can sit for about 30 to 40 minutes.  Tr. 83.  He said he can stand comfortably for about 5 to 10 minutes before he has to take a break because of his knee and because his hip is getting worse.  *Id.*  He said he can walk only 15 to 20 feet before his hip starts bothering him and his knee starts hurting more.  Tr. 84.  He testified he cannot lift and carry things weighing more than a couple of pounds in his right hand.  *Id.*  He does not use his left hand to lift due to the numbness.  *Id.*  He was offered injections for his left hand but refused them.  *Id.*

As for his living arrangements, Plaintiff testified that he lives with his girlfriend in a home.  Tr. 87.  Plaintiff sleeps during the day and is awake at

night, which is his preferred schedule.  He testified he does not do any

household chores because his girlfriend enjoys doing things for him and

knows his condition.  Tr. 87-88.  His girlfriend does the grocery shopping.

Tr. 89.  He can make a sandwich or heat up something in the microwave.

Tr. 89.  When he drives, it is for short distances and always at night

because he does not like to be out during the day.  Tr. 88-89.  Plaintiff

testified that at his last job, he worked the night shift.  Tr. 90-91.

On examination by his counsel, Plaintiff testified that he has visual

and auditory hallucinations, and he sometimes sees dead people.  Tr. 91.

He has the psychiatric problems in spite of taking medication.  Tr. 92.  He

said his mental and his physical problems both keep him from working.  *Id.*

The impartial vocational expert, Jackson McKay, testified that

Plaintiff's prior jobs as a security guard, which Plaintiff described as

sedentary, fell into the category of security officer/guard, DOT # 372.667-

038, light exertional level, SVP of 3, semi-skilled.[2]  Tr. 98.  His prior job of

---

[2] DOT refers to the Dictionary of Occupational Titles (4th Ed., Rev. 1991), which is one of the examples of sources that the ALJ may rely on for job information.  *See* SSR 00-4p; 20 C.F.R. § 404.1566(d).  The ALJ may also rely on a vocational expert or other specialist.  *See* § 404.1566(e).  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, Specific Vocational Preparation (SVP), 1991 WL 688702.  An SVP of 2 allows for "[s]hort demonstration only;" SVP of 3 allows for preparation time of "[o]ver 1 month up to and including 3 months;" SVP of 7 allows for "over 2 years up to and including 4 years."  *Id.*  Semi-skilled work is work that needs some skills but does

telephone installer/repairer, was described in DOT #822.381-018, heavy exertional level, SVP of 7, skilled.

The vocational expert was presented with a hypothetical scenario assuming a person with a change of age during the pendency of the proceeding from a younger person to one approaching advanced age, with a master's degree and the work experience as described by Plaintiff, who can sit, stand, and walk with reasonable customary breaks for six hours; lift at least 20 pounds occasionally and 10 pounds or less more frequently; can occasionally use his upper or lower extremities for push/pull operation of arm/hand or foot/pedal controls; can climb ramps and stairs occasionally, but never climb ropes, ladders, and scaffolding; can perform all other postural activities occasionally except crawling; can use right upper extremity to handle, finger, and feel frequently; should not work near unprotected heights, concentrated industrial vibrations, or run dangerous moving machinery; limited to unskilled or semi-skilled with an SVP of 1 to 4, with no limitation to attention, concentration, persistence, and pace based

---

not require doing the more complex work duties.  20 C.F.R. § 404.1568(b).  "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. . . ." and may require "reading blueprints or other specifications, or making necessary computations."  20 C.F.R. § 404.1568(c).

on educational background; and, can only occasionally interact with the public and coworkers.  Tr. 100-01.

Based on this hypothetical, the vocational expert was asked if Plaintiff could perform his relevant past work as he performed it or as it is described in the DOT.  Tr. 101.  The vocational expert opined that Plaintiff was capable of performing his past relevant work of security guard at an SVP of 2, as Plaintiff had performed it rather than SVP 3 as described in the DOT.  Tr. 101, 102-04.  The vocational expert testified that use of a cane to walk occasionally and change positions would not functionally interfere with the job, but that a security guard with a cane may not project the image an employer is trying to project.  Tr. 105-06.  During this testimony by the vocational expert, Plaintiff was asked if he used a cane in his last job as security guard, to which he responded he did not.  Tr. 106.  He said a guard must be physically fit and able to respond to any emergencies.  *Id.*

On cross-examination by Plaintiff's counsel, the vocational expert testified that no significant absences of more than once a month would be tolerated.  Tr. 105.

### B. The Decision of the Administrative Law Judge

In the decision issued on December 15, 2016, the ALJ made findings pertinent to this review.  Tr. 19-32.  Plaintiff met the insured status

requirements through December 31, 2017, and has not engaged in substantial gainful activity since October 1, 2013, the alleged onset date. Tr. 19.

The ALJ found Plaintiff had the severe impairments of a history of degenerative disc disease from L4-S1; history of anxiety and depression with transient psychotic symptoms well managed on his medications; history of obesity; history of mild degenerative joint disease of the right knee; history of prior left ankle fracture that is clinically stable; history of mild left-sided carpal tunnel syndrome managed well with a medication and wrist brace; history of diabetes without end organ damage; and, "a vast history of medication and medical noncompliance." Tr. 19.

The ALJ concluded that the totality of the psychiatric records did not support a finding that Plaintiff suffers from a delusional disorder or some form of paranoid schizophrenia; and the totality of the VA medical records do not support a delusional disorder and do not indicate his VA disability rating is based on any such psychiatric symptoms. Tr. 20. The ALJ noted the lack of longitudinal treatment records as well as consistent objective abnormalities to substantiate the existence of a medically determinable impairment of delusional disorder or paranoid schizophrenia. *Id.* The ALJ noted that Plaintiff also has the non-severe impairments of well-controlled

hypertension, sleep apnea with CPAP, and a history of gastritis/GERD with no significant treatment. *Id.*

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 20-23. In reaching this finding, the ALJ noted that no treating or examining physician has indicated findings that would satisfy the severity requirement of any listed impairment. The ALJ found that Plaintiff has mild restriction in activities of daily living, moderate difficulties in social functioning, and mild difficulties in concentration, persistence, or pace. Tr. 21.

As for Listings 12.04 and 12.06, the requirements of "paragraph B" must be satisfied. Tr. 20. This required that a mental impairment must result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[3] *Id.*

---

[3] A "marked" limitation is one that is more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, required three episodes within one year, or an average of every four months, with each lasting at least two weeks. 20 C.F.R. pt. 404, Subpt. P, App'x 1, § 12.00 (2016).

The ALJ concluded that evidence showed Plaintiff can handle daily finances, and that he attended adequately at the hearing and answered questions without difficulty. *Id.* (citing records at Tr. 242-51). Records indicated that upon testing, Plaintiff was consistently alert, with normal attention, although somewhat impaired in concentration. *Id.* Plaintiff was writing a biography of Frieda Kahlo and an exposition on the eviction of Adam and Eve. *Id.* The ALJ noted that Plaintiff's video game play required a significant amount of concentration. Thus, the ALJ found, there was no substantial evidence in the record of significant limitation that would adversely affect Plaintiff's ability to sustain focused attention and concentration in completion of tasks in most work settings. Tr. 21. The ALJ noted, in an abundance of caution, that the Residual Functional Capacity (RFC)[4] was formulated with moderate restrictions that reflect

---

[4] Residual functional capacity is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon all of the relevant evidence including the claimant's description of his or her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term '*residual functional capacity assessment*' describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

limitations secondary to Plaintiff's symptoms and his medication noncompliance.  *Id.* at 21-22.

The ALJ found that records reflect Plaintiff has not experienced episodes of decompensation of extended duration, and that Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration; thus, the requirements of "paragraph B" are not satisfied.  Tr. 22.

As for "paragraph C" requirements for Listing 12.04, the ALJ found that the evidence fails to establish Plaintiff had a chronic affective disorder of at least two years' duration causing more than a minimal limitation on Plaintiff's ability to do basic work, with symptoms or signs currently attenuated by medication or psychosocial support.  The ALJ concluded that the evidence also failed to demonstrate that Plaintiff had repeated episodes of decompensation, each of extended duration, or a residual disease process that has resulted in marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or a current history of one or more years of inability to function outside a highly supportive living arrangement.  *Id.*

As for Listing 12.06, the ALJ found that the record fails to demonstrate that Plaintiff's condition causes marked restrictions or results in a complete inability to function independently outside the area of one's home. *Id.* The ALJ also noted that no psychological consultant designated by the Commissioner on the issue of equivalence has concluded that a mental listing is medically equaled. *Id.*

In determining Plaintiff's RFC, the ALJ found that Plaintiff has the RFC to perform a light range of work, except that he can only occasionally use his upper or lower extremities for push/pull operation of arm/hand or foot/pedal controls; can perform occasional postural activities, but he cannot crawl or do any climbing of ladders, ropes, or scaffolds; can use upper extremities for frequent reaching, handling, fingering, and feeling objects within the light duty range (20 pounds occasionally and 20 pounds or less more frequently); and should not work near unprotected heights, concentrated industrial vibrations, or around dangerous moving machinery. Tr. 23. The ALJ found that mentally, Plaintiff can perform work that is at least unskilled or semiskilled in a work environment with only occasional interaction with the public, coworkers, and supervisors. *Id.*

In reaching this RFC, the ALJ cited evidence that Plaintiff can care for his personal needs, prepare meals, perform household chores of short

duration, operate a motor vehicle, shop for necessities, and handle daily

finances.  Tr. 24 (citing records at 242-65, 281-83).  The ALJ discussed the

medical evidence as it related to Plaintiff's musculoskeletal impairments

and mental impairments, and concluded:

> In sum, the claimant is undoubtedly limited by his
> musculoskeletal issues and psychiatric disorders, both of which
> are exacerbated by his excessive weight and vast treatment
> noncompliance, restricting him to light exertional level with the
> above noted nonexertional and mental limitations.  However,
> the medical record, the course of conservative treatment, the
> frequency and duration of care, the lack of treatment during the
> applicable period, and the claimant's own acknowledged
> abilities (i.e., performing activities of daily living, playing video
> games, attempting to become a writer, etc.) establish his
> capacity to perform work within the assessed residual functional
> capacity.  In addition, as noted throughout the medical records,
> objective imaging of the claimant's lower back, right knee and
> left ankle have found no significant degeneration, his physical
> exams regularly note good active ranges of motion, his
> monofilament testing has been negative and there are notations
> that he ambulates unassisted as well as notations of a normal
> or intact gait, indicating that a hand held assistive device is not
> medically necessary or required pursuant to SSR  96-9p.  Thus,
> the above residual functional capacity assessment is supported
> by the objective medical evidence as a whole.  The claimant
> has severe impairments that result in some limitation but he has
> no impairments, combination of impairments, or limitations
> severe enough to be disabling within the meaning of the Social
> Security Act.

Tr. 32.

Based on these findings, the ALJ concluded that Plaintiff is capable of

performing past relevant work as a Security Officer/Guard, DOT #372.667-

038, light exertional level, sedentary, as performed at the level of SVP 2,

semi-skilled; and Telephone Installer/Repairer, DOT #822.381-018, heavy

exertional level performed at medium, SVP of 7, skilled.  Tr. 32.

Accordingly, the ALJ found that Plaintiff was not under a disability as

defined in the Social Security Act from October 1, 2014, through the date of

the decision, December 15, 2016.  Tr. 33.

## II. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is

supported by substantial evidence in the record and premised upon correct

legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131

(11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less

than a preponderance.  It is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." Bloodsworth v.

Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The

Commissioner's factual findings are conclusive if supported by substantial

evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002)

(citations omitted).[5]  The Court may not decide the facts anew, reweigh the

---

[5] "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to

evidence, or substitute its judgment for that of the Commissioner,

Bloodsworth, 703 F.2d at 1239, although the Court must scrutinize the

entire record, consider evidence detracting from the evidence on which the

Commissioner relied, and determine the reasonableness of the factual

findings.  Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Parker v.

Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).  Review is deferential, but

the reviewing court conducts what has been referred to as "an independent

review of the record."  Flynn v. Heckler, 768 F.2d 1273, 1273 (11th Cir.

1985).

A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or

---

those parts of the record which support the ALJ.  A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.' "  Cowart
v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  An individual is entitled to disability insurance benefits if he or she is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

Pursuant to 20 C.F.R. § 404.1520(a)(4)(i)-(v), the Commissioner analyzes a claim in five steps.  Under the first step, the claimant has the burden to show that he is not currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  At the second step, the claimant must show he has a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  Step two is a threshold inquiry, and the ALJ does not go on to step three if the claimant fails to meet step two, but will find claimant is "not disabled."  McDaniel v. Bowen, 800 F.2d 1026, 1032 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the claimant must show that his severe impairment or combination of impairments meets or equals the criteria in the Listings of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant

cannot meet or equal one of the listings, the ALJ considers at step four whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work.  § 404.1520(a)(4)(iv).  If the claimant establishes he cannot perform his past relevant work, the burden shifts to the Commissioner at step five to show that significant numbers of jobs exist in the national economy that the claimant can perform in light of his RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(d), (g); Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); McMahon v. Comm'r, Soc. Admin., 583 F. App'x 886, 887 (11th Cir. 2014) (unpublished).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled and, consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.  The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 2007) (unpublished).  The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause

is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1527(c)(2).[6]  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053. (11th Cir. 1986).

The ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supported a contrary finding," the opinion is "conclusory or inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578,

---

[6] This provision applies to claims filed before March 27, 2017.  *See* 20 C.F.R. § 404.1527, "Evaluating opinion evidence for claims filed before March 27, 2017."  For claims filed after that date, the applicable provision is 20 C.F.R. § 404.1520c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."

582 (11th Cir. 1987)).  Where a treating physician has merely made

conclusory statements, the ALJ may afford them such weight to the extent

they are supported by clinical or laboratory findings and are consistent with

other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784

F.2d 1073, 1075 (11th Cir. 1986).  The reasons for giving little weight to the

opinion of the treating physician must be supported by substantial

evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and

must be clearly articulated.  Phillips, 357 F.3d at 1241.

Opinions on issues such as whether the claimant is unable to work,

the claimant's RFC, and the application of vocational factors, "are not

medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive

of the case; *i.e.*, that would direct the determination or decision of

disability."  20 C.F.R. § 404.1527(d); *see* Bell v. Bowen, 796 F.2d 1350,

1353-54 (11th Cir. 1986).  Although a claimant may provide a statement

containing a treating physician's opinion of his remaining capabilities, the

ALJ must evaluate such a statement in light of the other evidence

presented and the ALJ must make the ultimate determination of disability.

*See* 20 C.F.R. §§ 404.1512, 404.1513, 404.1527, 404.1545.

## III. Analysis

Plaintiff contends that the ALJ erred in giving only some weight to the medical opinions of Plaintiff's treating physician Dr. Jose Llinas, a board-certified psychiatrist, regarding Plaintiff's mental limitations.  ECF No. 12 at 11.  Plaintiff cites error in the ALJ's conclusions that the medical opinions were not consistent with treatment records, which the ALJ described as documenting "no consistent abnormalities during 2015," with Plaintiff's own statements that he was "doing well," and with Plaintiff's numerous missed appointments for his mental condition.[7]  *Id.* at 11-12 (citing Tr. 29).

Title 20 C.F.R. § 404.1527(c)(2) states in pertinent part:

> (2) Treatment relationship.  Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

---

[7] Plaintiff does not challenge the ALJ's findings relating to musculoskeletal or neuropathic impairments or his history of diabetes and obesity.  Thus, those issues are abandoned and will not be discussed in detail.  *See* Anglin v. Social Sec. Admin., 602 F. App'x 483, 484 (11th Cir. 2015) (unpublished).

20 C.F.R. § 404.1527(c)(2).[8]  An ALJ may discount a treating physician's

opinion when the opinion is conclusory, the physician fails to provide

objective medical evidence to support the opinion, the opinion is

inconsistent with the record as a whole, or the evidence supports a contrary

finding.  Lewis, 125 F.3d at 1440.

Plaintiff's health records from the VA medical center indicate that

Plaintiff was originally diagnosed with anxiety and depressive disorder.

Tr. 319, 417-20.  Dr. Llinas began to treat Plaintiff for his mental

impairments and continued to do so through 2016.  Tr. 346-353.  The ALJ

accorded only "some weight" to Dr. Llinas's opinions that Plaintiff was not

able to work due to his mental symptoms and had "marked" limitations in

understanding and remembering, concentrating, persistence, social

interaction and adaptation.  Tr. 29 (referring to records at Tr. 674-78).

The ALJ concluded that Dr. Llinas found no consistent significant

abnormalities during 2015, *i.e.*, no acute distress, full orientation, intact

neurological findings, and reports from Plaintiff that he was doing well.

Tr. 29.  The ALJ also explained his reasoning for giving only "some weight"

to the opinions of Dr. Llinas by noting that mental status testing in January,

April, and July 2014 was unremarkable in that Plaintiff was well groomed,

---

[8] *See* note 6 *supra*.

calm, cooperative, fully oriented, with normal speech, adequate cognition, excellent memory, normal affect, neutral or indifferent mood, with some depression.  Tr. 26.

Veterans Medical Center records from March 10, 2014, indicate that Plaintiff had a telephone conversation with a VA hotline and was "guarded" with the person to whom he spoke, and he voiced suspicion that the VA was conspiring to get rid of him as a patient.  Tr. 371.  Plaintiff reported he was despondent but was ambiguous about suicidal thoughts.  Plaintiff refused to give his address and the Gainesville Police Department was contacted to try to find Plaintiff to do a wellness check.  *Id.*  The VA was able to contact the mother of Plaintiff's child in Ocala who agreed to call Plaintiff.  *Id.*

Medical records from April 25, 2014, show that Plaintiff visited the VA medical center with a bad reaction to Risperdal, which had been prescribed for his mental condition.  Tr. 353-66.  His affect was labile and he was cordial but sometimes defensive.  Tr. 358.  Plaintiff reported being despondent and morose with thoughts of death, and stated that the VA is trying to kill him because the doctors are not meeting his needs.  Tr. 356.  However, he demonstrated fair insight, good judgment, and good impulse control.  Tr. 358.  He was prescribed Valium and Citalopram for his

depression and anxiety.  Tr. 364.  Notes show that Plaintiff reported he was writing a biography of Freida Kahlo and an "exposition on the eviction of Adam and Eve."  Tr. 357.

Medical records from a May 27, 2014, appointment with Dr. Llinas show in a psychiatry progress note that Plaintiff reported he was doing somewhat better.  Tr. 346.  The notes indicate that Plaintiff exhibited mild symptoms of paranoia concerning why his former doctor left, but the mental status examination showed Plaintiff was well groomed, alert, cooperative, fully oriented, with normal, relevant, coherent speech, but some depression.  Tr. 346-47.  His cognition was adequate, his memory excellent, and he had good insight most of the time into the nature of his problems.  Tr. 348.  Plaintiff did not have hallucinations or delusions or suicidal ideations.  *Id.*  The notes state "[t]here is no indication of a thinking disorder."  Tr. 347.

Plaintiff reported mood lability, anxiousness, and paranoid thoughts in 2014, but mental status records in July 2014 note that he cancelled his counseling sessions because "he no longer needs them."  Tr. 557.  Shortly thereafter, Plaintiff requested refills of Quetiapine, an antipsychotic medication that can treat schizophrenia, bipolar disorder and depression. Tr. 556.  In a September 29, 2014, visit with his primary care physician,

Plaintiff made paranoid statements about being spied on and his doctor

working for the CIA.  Tr. 544.  Plaintiff was diagnosed with

depression/psychosis, social anxiety, and generalized anxiety.  Tr. 546.

 In early October 2014, in a telephone consultation, Plaintiff denied

needing any mental health treatment and declined a referral for therapy.

Tr. 543-44.  He was reported to be calm with clear, coherent, and goal-

directed responses, without any indication of distress, although the notes

state he was in "some emotional distress two days earlier."  Tr. 543.  On

October 20, 2014, Plaintiff saw Dr. Llinas and reported that the Army had

put a contraption in his brain to control him.  Tr. 539.  Dr. Llinas's notes

indicate Plaintiff had limited contact with reality due to delusional thinking

and that his speech was slow.  He showed some depression and anxiety,

but denied suicidal ideations.  Dr. Llinas increased Plaintiff's medication.

*Id.*

 Records show that on January 20, 2015, Plaintiff was brought to the

emergency department after he cut himself with a knife.  Tr. 651.  He was

admitted to the acute psychiatric unit of The Vines Hospital under the Baker

Act.  *Id.*  Plaintiff reported "I wouldn't be here if I had just taken my

medications" and that stopping them made his depression worse.  *Id.*

Plaintiff reported suicidal thoughts, but denied the cutting was intended as

a suicide attempt.  Tr. 666-67.  This record contrasts with Plaintiff's

testimony at the hearing in which he stated the cutting was an intended

suicide attempt.  Tr. 75.  Medical records from The Vines Hospital reported

that Plaintiff had been diagnosed with paranoid schizophrenia in the past.

*Id.*  He exhibited poor eye contact, dysphoric mood, and he visual

hallucinations.  Tr. 667.  The notes state Plaintiff had difficulty

concentrating and had limited insight and judgment.  *Id.*

On March 16, 2015, Dr. Llinas diagnosed Plaintiff with a delusional

disorder and panic disorder with agoraphobia.  Tr. 672.  Dr. Llinas assigned

Plaintiff a Global Assessment of Functioning (GAF) score of 45.  *Id.*

Dr. Llinas assigned Plaintiff a GAF score of 60 on several other occasions,

which indicates only moderate symptoms.  Tr. 412, 561, 626, 633.  The ALJ

gave Plaintiff's GAF some partial weight.  Tr. 27.  The psychiatric

community has abandoned the GAF score as a measurement.[9]

---

[9] The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16.

The Fourth Edition of the American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000),

On May 27, 2015, Plaintiff asked for a refill of Quetiapine and stated he was "very much better." Tr. 840. Plaintiff denied any suicidal ideation. *Id.* In a July 29, 2015, message Plaintiff sent to his primary care provider, Plaintiff apologized for missing an appointment and cited his emotional disorder that sometimes constricts his ability to function normally. He stated that his Quetiapine medication helps "tremendously with [his] depression, self-harming, and suicidal ideations" and that "things are going smoothly at present." Tr. 765.

In an August 23, 2015, mental impairment questionnaire, Dr. Llinas stated Plaintiff's diagnoses as delusional disorder, depressive disorder, and anxiety disorder. Tr. 674. He noted severe depression and anxiety with suicidal ideation. Tr. 675. Dr. Llinas opined that Plaintiff had difficulty thinking or concentrating, poor memory, paranoia, irrational fears, panic

---

includes the GAF Scale that was primarily used by mental health practitioners. The GAF Scale was used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* A GAF scale rating of 41-50 is indicative of serious symptoms or serious impairment in social, occupational, or school functioning; a GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF scale rating of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. A GAF scale rating of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors and no more than slight impairment in social, occupational, or school functioning.

attacks, anxiety leading to isolation, and episodes of decompensation.

Tr. 675-76.  He found Plaintiff had marked limitations in multiple areas,

including remembering locations and work-like procedures, understanding

and remembering instructions, maintaining attention, concentration and

pace, working in coordination with others and interacting with the public,

and completing the workday without interruptions from psychological

symptoms.  Tr. 676-77.  Dr. Llinas also opined that Plaintiff was not a

malingerer.  Tr. 674.  Dr. Llinas opined that Plaintiff is "seriously mentally ill;

requires medications and supportive care to manage in civilian life" and

indicated that the symptoms and limitations apply as far back as October 1,

2013.  Tr. 678.

Dr. Llinas's Notes from September 28, 2015, indicate that Plaintiff

complained of some more negative ideas, which he attributed to the

Quetiapine the doctor had prescribed.  Plaintiff advised that he had altered

his medication by using some Risperdal tablets he had left.  Tr. 838. The

doctor counseled him not to alter his medication without medical advice.

*Id.*  A "formal mental status examination" on that date showed Plaintiff was

alert and fully oriented, with normal, relevant, and coherent speech; no

indication of a thinking disorder and no suicidal ideation or hallucinations.

He showed mild evidence of anxiety and depression, "but much closer to

the normal range." Plaintiff's cognitive functions, including memory, were not seriously impaired, and he had fair insight and judgment. *Id.*

On October 19, 2015, Dr. Llinas called Plaintiff after Plaintiff missed his appointment. Tr. 837. Plaintiff apologized and told Dr. Llinas that he was doing "all right" and had been "a little depressed" but not suicidal. *Id.* Plaintiff reported taking his medications with no problems. *Id.*

In December 2015, Plaintiff saw Dr. Llinas and angrily accused him of stopping his prescription of Lorazepam without warning. Tr. 831. A mental status exam on that day revealed Plaintiff was agitated, distrusting, and paranoid, with only fair contact with reality, some delusional thinking, and limited insight and fair judgment. Tr. 833-35. Plaintiff displayed some delusional thinking, but no hallucinations or suicidal ideations. Tr. 834. At that visit, Plaintiff's medications included Lorazepam (anxiety medication), Ziprasidone (atypical antipsychotic), and Zolpidem (insomnia). Tr. 834-35.

A mental status examination note by Dr. Llinas on February 25, 2016, indicated that Plaintiff continued to stay at home because when he goes out he is afraid he might hurt somebody. Tr. 827. The notes indicate Plaintiff was responding fairly well to his medications and Plaintiff thought they were working, although Plaintiff appeared depressed and anxious and had little or no insight into the nature of his problems. Tr. 828. The doctor

noted that his cognitive functions, including memory, were not seriously impaired. *Id.*

On May 2, 2016, Dr. Llinas wrote in his progress notes that Plaintiff reported "thought crowding" in his mind at night and said he needed stronger medicine. Tr. 823. Dr. Llinas noted that Plaintiff had been seeing him since February 2013, but often cancels appointments and stays away from outpatient contacts due to his social anxiety. *Id.* Dr. Llinas refused to prescribe Haldol, but increased Plaintiff's dosage of Qetiapine. A formal mental status examination showed Plaintiff to be alert and in good contact, fully oriented, with slow but coherent and relevant speech. There was no indication of a thinking disorder and no gross hallucinations or delusions. His cognitive functions including memory were not seriously impaired and Plaintiff had fair insight and judgment. *Id.*

Plaintiff was seen in the emergency department on July 24, 2016, for nausea after running out of Seroquel. Tr. 886. He also appeared anxious. *Id.* On August 1, 2016, he saw Dr. Llinas and explained that he had not taken his medication for several days because he had run out. Tr. 883. Dr. Llinas noted that Plaintiff could not explain how he ran out of medication, because the doctor had given him refills. *Id.*

Dr. Llinas also commented that Plaintiff was not taking his Lorazepam as directed, instead taking two or three when he has a panic attack rather than taking one at night.  *Id.*  Dr. Llinas commented in his notes that it was easy for Plaintiff to lose his temper when counseled about the proper way to take his medications, but stated, "[S]o long as he is taking his mood stabilizer I think the psychosis should be under control."  However, he noted, Plaintiff "has no insight so it is impossible to reason with him."  *Id.* Dr. Llinas noted that Plaintiff was tolerating his medication well, with a "good response," and was "stable at the present time."  *Id.*  Plaintiff reported he was significantly depressed and continued to have panic attacks about leaving home.  *Id.*  His speech was slow and memory somewhat impaired, with no insight and ability to be reasoned with.  *Id.* Dr. Llinas reported that the "formal mental status examination surprisingly otherwise is fairly benign."  Tr. 884.  Plaintiff had slow but otherwise normal speech; no evidence of hallucinations or delusions; no suicidal ideation; and somewhat impaired cognitive functions, but can "carry out his activities of daily living so long as he stays within the home and has his girlfriend to help him "get organized."  Tr. 884.

The ALJ concluded that Plaintiff's objective findings in the medical records fail to provide "strong support for the claimant's allegations of

disabling symptoms and functional limitations." Tr. 25. Accordingly, the ALJ found that his severe impairment of anxiety and depression with transient psychotic symptoms did not render him incapable of employment. *Id.* The ALJ relied on the "unremarkable" mental status records in 2014 and 2015 that generally indicated Plaintiff was well-groomed, calm, cooperative, fully oriented, with normal speech, adequate cognition, excellent memory, normal affect, neutral mood, and "some depression." Tr. 26. The ALJ cited inconsistencies in the records, such as those that showed Plaintiff delusional in October 2014, where just days before he was calm, with normal speech, no distress, clear, coherent, and goal directed responses. *Id.* The ALJ also cited the fact that Plaintiff was a "no show" numerous times throughout 2014, and had rarely sought out psychiatric care in 2015, which supported the conclusion that his symptoms were not as debilitating as he has alleged. Tr. 26-27, 28, 29.

The ALJ concluded that Dr. Llinas's August 2015 medical source statement that Plaintiff was experiencing "a litany of symptoms" and that Plaintiff had marked limitations in understanding and remembering, concentration and persistence, social interaction and adaptation—and his opinion that Plaintiff was unable to work—were not substantiated in the medical records. Tr. 29. The ALJ noted that Plaintiff played a lot of video

games and was working on writing a book, both of which are inconsistent with Plaintiff having limitations in concentration and persistence. Tr. 21, 26, 30. Plaintiff initially reported that he performed activities of daily living such as caring for personal needs, preparing light meals, performing some light household chores, operating a motor vehicle, some shopping, and handling daily finances. Tr. 21, 245-46, 263. At the hearing, however, Plaintiff testified he did no chores or shopping. Tr. 87-89.

The ALJ cited Dr. Llinas's records that found no consistent abnormalities during 2015. Tr. 29. The ALJ also relied on evidence that Plaintiff's treatment was conservative and that his symptoms were generally well-controlled on medication. Tr. 30-32. *See, e.g.*, Newberry v. Comm'r of Soc. Sec. Admin., 572 F. App'x 671, 671-72 (11th Cir. 2014) (unpublished) (conservative course of treatment can provide evidence that belies findings of severe limitation).

Dr. Llinas's opinions that Plaintiff was seriously mentally ill and unable to work were based primarily on Plaintiff's subjective complaints rather than any objective testing. *See, e.g.*, Medina v. Social Sec. Admin., 636 F. App'x 490, 493 (11th Cir. 2016) (unpublished) (articulation of reasons for giving treating physician's opinion little weight was sufficient where opinion was based primarily on claimant's subjective complaints). In

addition, the ALJ explained that the formal mental status examinations generally indicated Plaintiff was fully oriented, with normal speech and adequate cognition, excellent memory and satisfactory mood, with his depression and anxiety were well-controlled by medication when taken as directed.  Tr. 26-28.  For these reasons, the ALJ gave Dr. Llinas's opinions of Plaintiff's limitations and inability to work only some weight.

In a disability proceeding, the medical opinion of Plaintiff's treating physician is generally given "controlling weight" in determining the severity of a claimant's impairments.  *See* 20 C.F.R. § 404.1527(d)(2).  However, that is only the case if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence" in the record.  *Id.*  When the ALJ finds that a treating physician's opinion should not be given controlling weight, he must articulate his reasons for doing so.  Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  *See also* Copher v. Comm'r of Soc. Sec., 429 F. App'x 928, 929 (11th Cir. 2011) (unpublished).  The ALJ articulated his reasons for giving the treating physician's opinion only some weight in this case, and those reasons are sufficient to explain the weight given.

It must be remembered that "the mere existence of these impairments does not reveal the extent to which they limit [plaintiff's] ability to work or undermine the ALJ's determination in that regard." Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). *See also* McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work . . . ."). Disability concerns functional limitations on Plaintiff's ability to engage in work activities, not just whether a claimant has been diagnosed with an impairment.

Plaintiff testified that when he worked as an unarmed security guard at a construction location, he did so alone, at night, and very rarely interacted with the public or other coworkers. He primarily sat and monitored access to the building. Tr. 45, 79, 90. The ALJ determined that Plaintiff had the RFC to perform unskilled or semi-skilled, light work in an environment with only occasional interaction with the public, coworkers, and supervisors. Tr. 23. This RFC accounted for Plaintiff's social anxiety and desire not to be in public around many people. The ALJ concluded, based on this RFC and the evidence in the record, that Plaintiff could perform his past work, as performed, as a security guard in a semi-skilled, sedentary capacity. Tr. 32. "The Social Security regulations place a very

heavy burden on the claimant to show an inability to perform past relevant. Hutchinson v. Astrue, 408 F. App'x 324, 327 (11th Cir. 2011) (citing Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005)).  Plaintiff did not carry this burden.

As the Eleventh Circuit has reiterated, "If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it."  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Phillips, 357 F.3d at 1240 n.8).  The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]"  Phillips, 357 F.3d at 1240 n.8. The ALJ did not err in giving Dr. Llinas's opinions only some weight, and the reasons for doing so were fully articulated and supported by substantial evidence in the record.

Plaintiff also contends that the ALJ failed to properly evaluate his testimony in that the ALJ used "boilerplate" language in finding that Plaintiff's statements about his impairments were not entirely consistent with the medical and other evidence in the record.  Plaintiff argues that the ALJ's findings that his mental status was "unremarkable," that he often had normal findings, that he missed appointments, that he reported that he did not need mental health treatment—and the conclusion that he was

exaggerating his symptoms—were insufficient bases on which to discount Plaintiff's testimony.  ECF No. 12 at 21.  Plaintiff contends that Plaintiff's testimony should not be discounted because it was consistent with Dr. Llinas's opinions.  *Id.* at 22.

For the same supported reasons that the ALJ gave for explaining the weight given to Dr. Llinas's opinions, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence.  The ALJ did not err in failing to fully credit Plaintiff's testimony, as demonstrated by the record as a whole and explained in the ALJ's opinion. *See* Werner v. Comm'r of Soc. Sec., 421 F. App'x 935, 939 (11th Cir. 2011) (unpublished) (noting that "[t]he question is not . . . whether ALJ could have reasonably credited [the plaintiff's] testimony, but whether the ALJ was clearly wrong to discredit it").

## IV. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are supported by substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to 42 U.S.C. § 405(g), it is respectfully **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application Social Security benefits should be **AFFIRMED**

and judgment entered for the Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on August 2, 2018.


s/  Charles A. Stampelos_____
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**